UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MICHAEL L. DIXON,

Petitioner,

v.

Case No. 20-cv-8-pp

CHRIS BUESGEN,

Respondent.

---

**ORDER DENYING AMENDED PETITION FOR WRIT OF *HABEAS CORPUS* (DKT. NO. 15), DISMISSING CASE AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY**

---

On January 3, 2020, the petitioner, who is in custody at Stanley Correctional Institution and is representing himself, filed a petition for writ of *habeas corpus* under 28 U.S.C. §2254 challenging his June 16, 2015 conviction for two counts of second-degree sexual assault of a child. Dkt. No. 1. The court screened the petition and allowed the petitioner to proceed on his claims of ineffective assistance of trial and appellate counsel but stayed the case pending the exhaustion of the petitioner's state remedies. Dkt. No. 11 at 9-13. On February 1, 2023, the court reopened the case and ordered the petitioner to file an amended petition. Dkt. No. 14. The petitioner did so on March 30, 2023, dkt. no. 15, and the respondent filed an answer to the amended petition on November 22, 2023, dkt. no. 19.

The amended petition has been fully briefed since October 16, 2024. Dkt. Nos. 27 (opening brief), 34 (opposition brief), 39 (reply brief). The court regrets

that its caseload has prevented it from addressing the petitioner's case sooner. For the reasons provided below, the court will deny the amended *habeas* petition, dismiss the case and decline to issue a certificate of appealability.

## I. Background

### A. State Court Proceedings

The State charged the petitioner with five counts of sexual assault of four women, two of whom were children at the time of their assaults. Count One alleged that the petitioner had sexual intercourse with S.O., a child under 16, and Count Three alleged that the petitioner had sexual intercourse with D.D., also a child under 16. Dkt. No. 34-1 at 1. Counts Four and Five alleged sexual assault of S.E. with use of force. Id. at 2. Count Two alleged sexual assault of another victim with use of force, but the State moved to dismiss this count before trial. Id. at 1.

In May 2015, the State and the petitioner went to trial on Counts One, Three, Four and Five. After a three-day trial, a jury concluded that the petitioner sexually assaulted S.O. and D.D. based on DNA evidence that linked the petitioner to their assaults. Dkt. No. 19-1 at 2. There was no dispute that S.O. and D.D. were under the age of sixteen at the time of the assaults. On the second day of trial, the State informed the trial court that S.E. had changed her mind and would not testify. See Dkt. No. 34-4 at 4. The trial court dismissed Counts Four and Five related to S.E. See Dkt. No. 34-5 at 29.

The nature of the petitioner's ineffective assistance of trial and appellate counsel claims requires some background about the trial proceedings.

At trial, S.O. testified that she was sexually assaulted the night of October 27, 2002 when she was thirteen years old. Dkt. No. 34-2 at 22-24. She was walking to her mother's house in the evening when a man driving a car stopped to talk to her. The man pulled her into the car, drove to an alley and parked behind a house. Id. at 28, 30-31. He restrained S.O., told her to pull down her pants and sexually assaulted her in the car. Id. at 32-34. After the assault, the man drove S.O. to an intersection and told her to get out. Id. at 35-36. S.O. went to her mother's house and her mother called the police. S.O. was later taken to a hospital sexual assault treatment center. Id. at 36-37. The sexual assault nurse examiner collected a vaginal swab and sanitary pad from S.O. Dkt. No. 34-3 at 28-29.

D.D. testified that she was sexually assaulted the night of October 1, 2011 when she was fourteen years old. Id. at 39-44. She was walking home when a man in a car pulled up and offered her a ride home. He didn't take D.D. home. Instead, he pulled into an alley, parked behind a house, restrained her and told her to pull down her pants and sexually assaulted her in the car. After the assault, D.D. escaped the car and ran to a house nearby. Id. at 44-53. She called her sister, who picked her up and took her home. Id. at 54. D.D.'s mother called the police and D.D. was later taken to the Aurora Sinai Hospital's Sexual Assault Treatment Center in Milwaukee. Id. at 54-55.

On October 2, 2011, Sexual Assault Nurse Examiner (SANE) Debra Martinez attended to D.D. at the sexual assault treatment center. Id. at 105. Martinez was unavailable to testify at trial due to a family emergency. Id.

Consequently, the written records Martinez created during her examination of D.D. and the physical evidence she collected from D.D.—a buccal swab, vaginal swabs and semen-stained jeans and underwear—were admitted through the testimony of Martinez's managing nurse, Gina Kleist. Id. at 103-104. Kleist testified that she was familiar with Martinez and her work and the hospital's documentation and collection procedures utilized by SANE staff. Kleist read portions of Martinez's report into the record, including D.D.'s description of the assault and Martinez's description of her examination of D.D. and her collection of the physical evidence. Id. at 103-16. Kleist testified that the physical evidence Martinez collected was all labeled according to the sexual assault treatment center's standard procedures. Id. at 117-25.

Detective Gregory Jackson testified to establish the chain of custody of the physical items Martinez had collected from D.D. He testified that he picked up the physical evidence collected from D.D. from the Sexual Assault Treatment Center at Aurora Sinai Hospital, placed them into inventory and transported them to the Wisconsin State Crime Laboratory in Milwaukee. Dkt. No. 34-3 at 93-94. He described the procedures and protocols he followed to document the chain of custody. Id. at 94-95. The inventory Jackson completed and the receipt he received when he took the items to the crime lab were admitted into evidence. Id. at 94-99.

Brittany Paulson, a State Crime Laboratory DNA analyst, examined the vaginal swabs and jeans taken from D.D. Paulson testified that she analyzed the DNA sample of semen taken from the vaginal swabs and jeans and

generated a DNA profile. Dkt. No. 34-4 at 68-71. Paulson reviewed the DNA profile that another analyst at the crime lab developed from a buccal swab the petitioner provided to authorities in 2012. Id. at 71-72. Comparing the DNA sample taken from the vaginal swabs and the jeans collected from D.D. to the petitioner's, Paulson testified that the DNA profile matched the petitioner's. Id. at 72-74. Paulson told the jury that the chance of finding another person with the petitioner's DNA profile was one in 241 quintillion people and that to a reasonable degree of scientific certainty, the petitioner was the source of the DNA collected from the vaginal swab and jeans.[1] Id. at 74-78.

Lisa Treffinger, another State Crime Laboratory DNA analyst, examined the sanitary pad taken from S.O. Treffinger analyzed the DNA sample of semen taken from the sanitary pad and generated a DNA profile. Id. at 39-41. Treffinger reviewed the DNA profile that another analyst at the crime lab developed from the buccal swab the petitioner provided to authorities in 2012. Id. at 42-44. Comparing the DNA sample taken from S.O.'s sanitary pad to the petitioner's DNA, Treffinger testified that the DNA profile matched the petitioner's. Id. at 44-45. Treffinger testified that the chance of finding another person with the petitioner's DNA profile was one in 241 quintillion people and that to a reasonable degree of scientific certainty, the petitioner was the source of the DNA collected from the sanitary pad. Id. at 46-47.

The petitioner testified at trial. He told the jury that when he was taken into custody for questioning by Detective Branco Stojsavljevic, he received a

[1] A quintillion is a number with eighteen zeros: 1,000,000,000,000,000,000.

Miranda[2] warning and agreed to talk to the detective. Dkt. No. 34-5 at 32-33. He testified that he voluntarily gave the detective a buccal swab with his DNA because he "had nothing to hide." Id. at 33.

Following the jury verdict, the petitioner was convicted on Counts One and Three for sexual assault of S.O. and D.D. and sentenced to forty-five years in prison followed by twenty-five years of extended supervision. Dkt. No. 19-1 at 2.

B. Federal *Habeas* Petition

On January 3, 2020, the petitioner filed a petition for writ of *habeas corpus*. Dkt. No. 1. The court screened the petition and allowed him to proceed on his claims of ineffective assistance of trial and appellate counsel but stayed the case pending the exhaustion of the petitioner's state remedies on all the claims asserted in the petition. Dkt. No. 11 at 9-13. On February 1, 2023, the court reopened the case and ordered the petitioner to file an amended petition. Dkt. No. 14.

On March 30, 2023, the court received the amended petition, which is the operative petition. Dkt. No. 15. It asserts twelve grounds for relief. Grounds One and Two assert ineffective assistance of trial counsel. Dkt. No. 15 at 6-8, 15. Grounds Three through Eleven assert ineffective assistance of appellate counsel. Id. at 8-9, 16-27. Ground Twelve asserts a due process claim based on a state court denial of the petitioner's motion for postconviction discovery. Id.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

at 27-28. On November 22, 2023, the respondent filed an answer to the amended petition. Dkt. No. 19.

## II. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, a federal court may grant *habeas* relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Miller v. Smith, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. §2254(d)(1), (2)). A federal *habeas* court reviews the decision of the last state court to rule on the merits of the petitioner's claim. Charlton v. Davis, 439 F.3d 369, 374 (7th Cir. 2006).

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Renico v. Lett, 559 U.S. 766, 773 (2010) (quoting Williams v. Taylor, 529 U.S. 362, 411 (2000)). Indeed, "[t]he 'unreasonable application' clause requires the state court decision to be *more* than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (emphasis added). In other words, §2254(d)(1) allows a court to grant *habeas* relief only where it determines that the state court applied federal law in an "objectively unreasonable" way. Renico, 559 U.S. at 773. "A state court's determination that a claim lacks merit

precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standard under § 2254(d) is 'difficult to meet' and 'highly deferential.'" Saxon v. Lashbrook, 873 F.3d 982, 987 (7th Cir. 2017) (quoting Cullen v. Pinholster, 563 U.S. 170, 181 (2011)).

**III. Discussion**

All but one of the grounds asserted in the amended petition rest on the petitioner's claim that either his trial or his appellate counsel was ineffective. "Under *Strickland v. Washington*'s familiar, two-pronged test for ineffective assistance of counsel, [the petitioner] must demonstrate that (1) his counsel's performance was deficient; and (2) that deficiency resulted in prejudice." United States v. Berg, 714 F.3d 490, 496-97 (7th Cir. 2013) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). "The performance prong of *Strickland* requires a [petitioner] to show 'that counsel's representation fell below an objective standard of reasonableness.'" Lafler v. Cooper, 566 U.S. 156, 163 (2012) (quoting Hill v. Lockhart, 474 U.S. 52, 57 (1985)). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington, 562 U.S. at 105 (quoting Strickland, 466 U.S. at 690). "To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Lafler, 566 U.S. at 163

(quoting Strickland, 466 U.S. at 694). In the context of federal *habeas* proceedings, the Supreme Court has stated that

> [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254 is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential", and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

Harrington, 562 U.S. at 105 (internal citations and quotations omitted). "[O]nly a clear error in applying Strickland would support a writ of *habeas corpus*." Taylor v. Bradley, 448 F.3d 942, 948 (7th Cir. 2006) (quoting Murrell v. Frank, 332 F.3d 1102, 1111 (7th Cir. 2003)). The inquiry is whether the state court "took the constitutional standard seriously and produce[d] an answer within the range of defensible positions." Id. (quoting Mendiola v. Schomig, 224 F.3d 589, 591 (7th Cir. 2000)) (alteration in original).

A. Ground One

Ground One asserts that the petitioner's trial counsel was ineffective for failing to object that the admission at trial of evidence collected by SANE Martinez through Kleist's testimony violated the Confrontation Clause of the Sixth Amendment. Dkt. No. 15 at 6-7.

1. *The Parties' Arguments*

The petitioner argues that his trial counsel should have objected that the introduction of Martinez's report and the physical evidence she had collected

from D.D. through a surrogate witness's testimony violated the Sixth Amendment's Confrontation Clause. Dkt. No. 27 at 14-15. He asserts that before that evidence—including the DNA sample collected from D.D.'s vaginal swabs and jeans—could be admitted, his trial counsel should have demanded that the State produce Martinez at trial. The petitioner argues that had his trial counsel made such a Confrontation Clause objection, the State would not have had available to it the DNA identification evidence it used to link him to the sexual assault of D.D.[3] See id. at 15-18.

The respondent argues that the Wisconsin Court of Appeals reasonably applied Strickland's two-pronged test when it addressed the petitioner's claim of ineffective assistance of trial counsel. Dkt. No. 34 at 18-19. The respondent argues that the court of appeals reasonably determined that the petitioner could not show prejudice under Strickland's second prong. According to the respondent, the decision was reasonable because Martinez's testimony was not required to authenticate the physical evidence, which included the DNA sample, recovered from D.D. Id. The respondent also argues that because the court of appeals decision was based on a state evidentiary rule, this claim is not cognizable under federal *habeas* review. Id. at 17.

2. *The Wisconsin Court of Appeals' Decision*

"A petitioner's habeas claim is considered against the last reasoned state court decision on the merits." Minnick v. Winkleski, 15 F.4th 460, 469 (7th Cir.

[3] The petitioner does not challenge the DNA evidence used to convict him on the charges related to the sexual assault of S.O.

2021) (citing Wilson v. Sellers, 584 U.S. 122, 125 (2018); Makiel 782 F.3d 882, 896 (7th Cir. 2015)). The petitioner raised the claim asserted in Ground One in his direct appeal; the Wisconsin Court of Appeals' last reasoned decision on the merits of that claim is the decision dated June 27, 2018. State v. Dixon, 383 Wis. 2d 602 (Table), 2018 WL 3198768 (Wis. Ct. App. 2018).

When the last state court decision rests its analysis on one of the Strickland prongs, the court should "confine [its] analysis to that prong." See Minnick, 15 F.4th at 469. When considering the petitioner's claim that trial counsel was ineffective for failing to object to the introduction of the evidence collected by Martinez through Kleist, the Wisconsin Court of Appeals relied on Strickland's prejudice prong, holding that the petitioner was not prejudiced by not having an opportunity to cross-examine Martinez. The court of appeals explained its reasoning:

> "The Confrontation Clauses of the United States and Wisconsin Constitutions guarantee criminal defendants the right to confront witnesses against them." ***State v. Hale***, 2005 WI 7, ¶43, 277 Wis. 2d 593, . . .; U.S. CONST. amend. VI, WIS. CONST. art. 1, § 7. [The petitioner] argues that Martinez's own testimony was necessary to properly authenticate the evidence because only she possessed the knowledge that it was what it was claimed to be, *see* WIS. STAT.§ 909.015(1), whereas Kleist had no personal knowledge about it.
>
> "The requirements of authentication or identification as a condition precedent to admissibility are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." WIS. STAT. § 909.01. The list of examples of ways to authenticate offered in WIS. STAT. § 909.015 is not an exhaustive list. ***State v. Baldwin***, 2010 WI App 162, ¶55, 330 Wis. 2d 500, . . . .
>
> Here, the physical evidence obtained during Martinez's examination of D.D. was authenticated through circumstantial evidence, another

recognized means. *See* ***State v. Giacomantonio***, 2016 WI App 62, ¶20, 371 Wis. 2d 452, . . .. As Martinez's manager and a certified SANE herself, Kleist was familiar both with Martinez's work and documentation procedures used at Aurora Sinai. She described the standard procedures all of the Aurora Sinai nurses follow when conducting sexual assault examinations and when collecting and packaging evidence to maintain the chain of custody. Kleist testified that the evidence bearing D.D.'s name and the date of collection on the packaging were labeled according to those procedures.

The State's case against [the petitioner] in regard to D.D. depended on DNA recovered from the vaginal swabs and jeans procured during the SANE examination. He thus contends that Martinez's testimony was critical to establish the first link in the chain of custody because she obtained the physical evidence taken from D.D., created the written "Chain of Custody of Evidence Report For Sexual Assault Evidence," and packaged the evidence admitted as exhibits at trial. An objection, he argues, would have prevented admission of the evidence and a foundation from being laid for the subsequent testimony of the State Crime Lab analyst regarding her analysis of D.D.'s DNA extracted from the evidence in those exhibits. The analyst testified that, to a reasonable degree of scientific certainty, the DNA on the vaginal swabs and on D.D.'s jeans matched [the petitioner's] profile.

"The degree of proof necessary to establish a chain of custody is a matter within the trial court's discretion." ***B.A.C. v. T.L.G.***, 135 Wis. 2d 280, 290, . . . (Ct. App. 1986). The proof must be sufficient "to render it improbable that the original item has been exchanged, contaminated or tampered with." ***Id.*** "A perfect chain of custody is not required." ***State v. McCoy***, 2007 WI App 15, ¶9, 298 Wis. 2d 523, . . . (2006). Alleged gaps in the chain go to the weight of the evidence, not its admissibility. ***Id.***

We see no prejudice. A Milwaukee Police Department Sensitive Crimes Division detective testified that he obtained items of evidence from Aurora Sinai and followed specific protocols to document the chain of custody from picking up the evidence through taking it to the Crime Lab. He identified two exhibits: an inventory documenting twelve items he retrieved from Aurora Sinai that were collected from D.D., and the receipt he received when he took the items inventoried as being associated with D.D. to the Crime Lab.

The Crime Lab analyst who examined the vaginal swabs and jeans recovered from D.D. testified that when the Crime Lab tests evidence brought to the lab by an outside agency, there is a standard protocol

> that every analyst follows "every step of the way from receiving evidence through the testing process." She also testified that the vaginal swabs and the jeans were in separate envelopes, each with a patient label of D.D. and a particular laboratory bar code.
>
> We are satisfied that the proof was sufficient to "render it improbable that the original item has been exchanged, contaminated or tampered with." ***B.A.C.***, 135 Wis. 2d at 290. [The petitioner] was not prejudiced by the lack of an objection to the chain of custody.
>
> Taking another tack, [the petitioner] asserts that Martinez's absence prejudiced his defense because he had no chance to cross-examine her about the narrative portions of her report—what she observed and recorded about D.D.'s description of the sexual assault—or with respect to any "biases, exaggerations, or inaccuracies" in her reports, or inconsistencies between what D.D. told her then and later testified to at trial.
>
> We are left to guess at what "biases, exaggerations, or inaccuracies" required cross-examination. As to "inconsistencies," [the petitioner] asserts that D.D. testified at trial that he "choked her and that she had trouble breathing," in contrast to the sexual assault record indicating that she told Martinez no strangulation was involved. While the sexual assault record does show that the "No" box is checked after "Strangulation," Martinez wrote in the narrative section of the report that D.D. said her assailant was "holding my neck."
>
> We think [the petitioner] nitpicks about semantics. D.D. was just fourteen at the time of the assault. The trial was held several years later. Whether she said he "choked" or "strangled" or "held her neck" is immaterial when the only two elements to be proved were that [the petitioner] had sexual intercourse with her when she was less than sixteen years old. Cross-examination of Martinez on the precise descriptor would have changed nothing. Further, defense counsel impeached D.D.'s credibility when she admitted on cross-examination that she lied to police, telling them her assailant had grabbed her and pulled her inside his car, when in fact she willingly had accepted his offer to give her a ride home. [The petitioner] has not proved prejudice from not having the opportunity to cross-examine Martinez.

<u>Dixon</u>, 2018 WL 3198768, at *2-*3.

3. *The Court's Analysis*

Based on the record, the Wisconsin Court of Appeals reasonably concluded that the petitioner was not prejudiced by his trial counsel's failure to object to the absence of Martinez. The State was required to prove two elements to convict the petitioner on Count Three: (1) the petitioner had sexual intercourse with D.D. and (2) D.D. was under the age of sixteen at the time of the alleged offense. See Dkt. No. 34-1. There was no dispute that D.D. was fourteen at the time of the alleged assault. The State relied on DNA evidence to establish that the petitioner had sexual intercourse with D.D. This means that the State had to show that the buccal swab, vaginal swabs and semen-stained jeans and underwear introduced at trial were what the State purported them to be: physical objects collected from D.D. by Martinez at the Sexual Assault Treatment Center on October 2, 2011.

The court of appeals concluded that there was no prejudice because there was sufficient evidence to authenticate Martinez's report and the physical evidence Martinez had collected from D.D. Under Wis. Stat. §909.01, "[t]he requirements of authentication or identification as a condition precedent to admissibility are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." There are two ways to show that a physical object or a document introduced at trial is what its proponent claims it is: direct evidence and circumstantial evidence. An example of direct evidence is testimony of a witness with knowledge that the physical object or document is what it is claimed to be. See Wis. Stat. §909.015(1). Examples of

circumstantial evidence are unique characteristics such as "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." See id. §909.015(4).

The record shows that there was enough direct and circumstantial evidence to authenticate Martinez's report and the physical evidence she had collected from D.D. Kleist testified that she worked at the Aurora Sinai Hospital Sexual Assault Treatment Center with Martinez. Kleist was Martinez's managing nurse for several years. She was familiar with Martinez's work at the treatment center and had reviewed other reports Martinez had prepared while working there. Kleist also was familiar with the treatment center's examination procedures and record keeping policies and practices. Kleist testified that she personally reviewed Martinez's report regarding her examination of D.D., examined the physical evidence collected from D.D. and confirmed that the report and physical evidence were prepared and kept consistent with the hospital treatment center's policies and practices.

The State's examination of Kleist demonstrates that there was enough evidence to lay a foundation for the authentication of Martinez's report and the physical evidence collected from D.D.:

> [PROSECUTOR]: Ms. Kleist, what do you do for work?
>
> [KLEIST]: I'm currently the manager of Three Women's Health Clinic at Sinai Hospital, and I also work as an on-call sexual assault nurse.
>
> [***]
>
> [PROSECUTOR]: Now, are you familiar with a nurse by the name of Debra Martinez?

[KLEIST]: Yes, I am.

[PROSECUTOR]: Is she a nurse you worked with?

[KLEIST]: Yes, I was her manager.

[***]

[PROSECUTOR]: So you're familiar with her work?

[KLEIST]: Yes.

[PROSECUTOR]: And you are familiar with her reports?

[KLEIST]: Correct.

[***]

[PROSECUTOR]: Now, did you have an opportunity to review the medical report prepared by Debra Martinez regarding her examination on October 2nd, 2011, of a girl by the name of [D.D.]?

[KLEIST]: I did.

[***]

[PROSECUTOR]: Now, I'm showing you what has been marked as Exhibit 17, can you tell me what that is?

[KLEIST]: That's her medical record.

[PROSECUTOR]: That's [D.D.]'s medical record reflecting the examination that was conducted on October 11th by nurse Debra Martinez?

[KLEIST]: Yes.

[PROSECUTOR]: And a family emergency prevents Nurse Martinez from being here?

[KLEIST]: Correct.

[PROSECUTOR]: Now, you have reviewed this report?

[KLEIST]: Correct.

[PROSECUTOR]: You reviewed this report cover to cover to be prepared for testifying today?

[KLEIST]: I did review up to, I believe, Page it doesn't have a page, the visit follow-up. I reviewed all of Debra Martinez's care that she provided to [D.D.].

[***]

[PROSECUTOR]: Now, is there a standard procedure that's followed at Aurora Sinai regarding sexual assault examinations?

[KLEIST]: Yes.

[PROSECUTOR]: And that's a procedure that's followed by all of the nurses?

[KLEIST]: Correct.

[***]

[PROSECUTOR]: I'm showing you what has been marked as Exhibit 18, can you tell me what that is?

[KLEIST]: This is an envelope that we package the evidence in.

[PROSECUTOR]: And is there a standard procedure that you follow in packaging evidence?

[KLEIST]: Yes.

[PROSECUTOR]: So every nurse is trained to do it in exactly the same way?

[KLEIST]: Correct.

[PROSECUTOR]: Why is that?

[KLEIST]: To maintain chain of custody and for it not to be contaminated.

[PROSECUTOR]: Everyone should do it the same way so that there are no slipups?

[KLEIST]: Correct.

[PROSECUTOR]: Exhibit 18, can you tell from looking at the packaging and documentation on it what it is and who packaged it up?

[KLEIST]: I can tell these are buccal swabs, which is from inside the cheeks. I can tell you when it was done, who it was collected by we just usually put our initials.

[PROSECUTOR]: Can you tell who it's collected from?

[KLEIST]: From the initials?

[PROSECUTOR]: Not who collected it but what patient it was collected from, can you tell that?

[KLEIST]: Yes.

[PROSECUTOR]: Who was that collected from?

[KLEIST]: [D.D.].

[PROSECUTOR]: And that's standard procedure, to mark on the envelope who you got the evidence from?

[KLEIST]: Correct.

[PROSECUTOR]: It's done in every case?

[KLEIST]: Yes.

[PROSECUTOR]: No exceptions?

[KLEIST]: Correct.

[PROSECUTOR]: And can you tell the date upon which it was collected?

[KLEIST]: 10-2-2011.

[PROSECUTOR]: Again, it's standard procedure and done in every case, you note the date on which the evidence is collected?

[KLEIST]: Yes.

Dkt. No. 34-3 at 102:4-7, 103:18-22, 104:2-5, 104:16-20, 104:24-105:16, 105:25-106:6, 117:7-118:25; see also id. at 119:22-120:1-10 (authenticating

vaginal swabs); id. at 121:7-123:6 (authenticating jeans); id. at 123:25-124:24 (authenticating underwear).

There was enough evidence to establish the chain of custody of the physical evidence collected from D.D. as well. To establish chain of custody, there must be enough evidence to show that it is improbable that the original item has been "exchanged, contaminated or tampered with." In re Paternity of J.S.C., 135 Wis. 2d 280, 290 (Wis. Ct. App. 1986). As recounted above, Kleist testified that she examined the physical evidence collected from D.D. and confirmed that the report and physical evidence were prepared and kept consistent with the treatment center's policies and practices. Dkt. No. 34-3 at 117:7-118:25.

Chain of custody of the physical evidence collected from D.D. was further established through Detective Gregory Jackson. He testified as follows:

> [PROSECUTOR]: Detective Jackson, I'm showing you what has been marked as Exhibit 22, can you tell me what that is?
>
> [JACKSON]: This is an inventory filled out by me. I actually filled it out, and the date and time was October 7th, 2011, and at the time I was retired from th[e] Milwaukee Police Department.
>
> [***]
>
> [PROSECUTOR]: All right. This document, what I showed you, Exhibit 22, those are documents you have used before you retired for years?
>
> [JACKSON]: Correct.
>
> [PROSECUTOR]: And continue to use in your current position?
>
> [JACKSON]: Correct.
>
> [PROSECUTOR]: And there are standard forms and specific procedures regarding filling those out?

[JACKSON]: Correct.

[PROSECUTOR]: And you were then and are now familiar with those procedures?

[JACKSON]: I have performed the same procedures for the past sixteen years when I was with Sensitive Crimes.

[PROSECUTOR]: And do you recognize your handwriting on Exhibit 22?

[JACKSON]: Yes.

[PROSECUTOR]: And is that your handwriting?

[JACKSON]: Correct.

[PROSECUTOR]: What does that document tell you?

[JACKSON]: This is evidence which I inventoried from victim [D.D.]. There are a total of twelve items and they are all items that I would typically pick up from the Sexual Assault Treatment Center or maybe the Child Protection Center that was associated with a rape kit.

[PROSECUTOR]: Now, does this document. Exhibit 22, indicate where you retrieved the items?

[JACKSON]: Yes.

[PROSECUTOR]: And where did you obtain those items?

[JACKSON]: These items were picked up at the Sexual Assault Treatment Center at Aurora.

[PROSECUTOR]: Now, I presume you have no independent memory of picking up these particular items of evidence?

[JACKSON]: Not individually, no. I can only reply upon my signature and the date what I performed on that particular date.

[PROSECUTOR]: And is this a procedure you follow in all cases when you pick up items of evidence from the Sexual Assault Treatment Center and place them on inventory?

[JACKSON]: Yes, eliminating any other individual from handling the evidence to preserve the chain of custody.

> [***]
>
> [PROSECUTOR]: Detective Jackson, I'm showing you what has been marked as Exhibit 23, do you recognize that sort of document?
>
> [JACKSON]: I do.
>
> [***]
>
> [PROSECUTOR]: What is that document?
>
> [JACKSON]: This is this is what they give us as a receipt that we had these items and they were conveyed to the Crime Lab, conveyed by me, as documented here, the items by letters, but exactly what was given there, the date, the time, and the signature of the person who received this evidence at the Crime Lab, the Crime Lab specialist.
>
> [PROSECUTOR]: Does that document indicate to you that you took these items from the property of the Milwaukee Police Department Secure Property and took them out to the Crime Lab, who received them and gave you a receipt for the items received?
>
> [JACKSON]: That's correct. These are the items I inventoried with the victim with the name being [D.D.].
>
> [PROSECUTOR]: And this is the receipt the Crime Lab gives you back?
>
> [JACKSON]: Correct.
>
> [***]
>
> [PROSECUTOR]: So you don't drop them in some sort of overnight box or send them by mail, you personally take them out and hand them to the Crime Lab?
>
> [JACKSON]: Yes, that's reflected in the paperwork. It's submitted by me personally to the other person to preserve the chain of custody, and I did personally convey them to the Crime Lab myself.

Dkt. No. 94:23-95:4, 95:21-97:13, 97:25-98:3, 98:8-99:2, 99:13-19.

Jackson's testimony is sufficient to lay a foundation that the physical evidence collected from D.D. had not been exchanged, contaminated or tampered with between the time Martinez collected it from D.D., when it was

transported from Aurora Sinai Hospital to the Milwaukee Police Department and when it was transported from the police department to the crime lab for analysis.

The crime lab analyst, Paulson, provided additional foundation for the chain of custody. She testified that the crime lab uses internal tracking for all DNA evidence processed by the lab.

> [PROSECUTOR]: So you have protocol every step of the way from receiving evidence through the testing process?
>
> [PAULSON]: Yes, basically there's an instruction manual that has step-by-step instructions for the procedures you do.
>
> [PROSECUTOR]: And every analyst is required to follow this protocol?
>
> [PAULSON]: Yes.

Dkt. No. 34-4 at 65:15-22. Paulson confirmed that the physical evidence from which the DNA sample was taken belonged to D.D. and that the lab received it from the Milwaukee Police Department.

> [PROSECUTOR]: Now, I want to ask you some specific questions about DNA testing. You performed, on evidence that was given to you regarding a young woman by the name of [D.D.], did you perform testing on evidence from a person by the name of [D.D.]?
>
> [PAULSON]: Yes.
>
> [PROSECUTOR]: Where did that evidence come from?
>
> [PAULSON]: It was sent into the laboratory from the Milwaukee Police Department.

Id. at 67:1-10.

Martinez was not the critical link for the State's case. The testimony from Kleist, Jackson and Paulson provided more than enough evidence to lay a

foundation to authenticate Martinez's report and the physical evidence Martinez collected from D.D. and to establish the chain of custody. The court concludes that the Wisconsin Court of Appeals' application of Strickland to hold that there was no prejudice was reasonable.

The petitioner also argues that there were inconsistencies in what D.D. told Martinez during the sexual assault examination and that he was denied the opportunity to cross examine Martinez about those inconsistencies in violation of his rights under the Confrontation Clause. The petitioner highlights two inconsistencies: (1) D.D. testified that she was wearing "red jeans," but the jeans Martinez collected from D.D. at the sexual assault treatment center were blue, see dkt. no. 34-3 at 49, 70, 122-23, and (2) D.D. told Martinez her assailant was "holding my neck," but D.D. testified at trial that her assailant "choked" her and that she had trouble breathing, see id. at 48, 108.[4]

The court of appeals reasonably concluded that the petitioner was not prejudiced by not having an opportunity to cross-examine Martinez about these inconsistencies. The Confrontation Clause applies only to "the admission at trial of 'testimonial statements' of an *absent* witness" that the defendant had not previously cross-examined. Smith v. Arizona, 602 U.S. 779, 783 (2024) (citing Crawford v. Washington, 541 U.S. 36, 53–54 (2004)) (emphasis added). The Confrontation Clause is not implicated here. *D.D.* made the statements about the red jeans and the choking. And the petitioner had the opportunity to

[4] The Wisconsin Court of Appeals also observed that Martinez's report had a check box for "strangulation" that was marked "No." Dkt. No. 19-11 at 7.

cross-examine *D.D.* at trial about the inconsistencies between her testimony about the choking and what she told Martinez about her assault as recounted in the medical report. The petitioner also had the opportunity to cross-examine D.D. about the inconsistency between her testimony that she had been wearing "red jeans" during the assault with the blue jeans Martinez had collected from her on the day of the assault. The court of appeals' conclusion that there was no prejudice from the absence of *Martinez* was reasonable because there was no Confrontation Clause violation and trial counsel was not ineffective for failing to raise the objection.

The petitioner also argues that this case is similar to State v. Smith, 982 N.W.2d 354 (Table), 2022 WL 4349801 (Wis. Ct. App 2022), where the Wisconsin Court of Appeals held that trial counsel's failure to make a Confrontation Clause objection may have constituted deficient performance. See Dkt. No. 39 at 8. Smith is not comparable to the facts of the petitioner's case.

In Smith, a sexual assault victim found herself in a hospital. She had no memory of what had occurred between the time she arrived at a concert venue and when she woke up in the hospital. Smith, 2022 WL 4349801, at *1. When she woke up, she noticed vaginal bleeding and thought someone may have sexually assaulted her. Id. While the precise sequence of events isn't clear, it's apparent that the victim sought to collect evidence of a potential assault. The victim was evaluated by medical professionals three separate times during the same day. Id. at *5. After she woke up in the hospital, the victim was

discharged early in the morning and advised to go to the Aurora Sinai Hospital emergency room. She went to the emergency room and was discharged that same morning. Fourteen hours later, the victim returned to the Aurora Sinai Hospital to undergo an examination at the sexual assault treatment center. Id. The victim was examined by C.H., a nurse. C.H. created a medical record containing the victim's statements. C.H.'s notes stated that the victim returned to the hospital "to have evidence collected and report to police." Id. C.H. did not testify at trial. Instead, C.H.'s treatment notes were admitted through L.K., a managing nurse at the sexual assault treatment center. Id. at *1.

The defendant filed a postconviction motion arguing that C.H.'s statements were testimonial and that he was denied his rights under the Confrontation Clause to confront C.H. The court of appeals agreed that the defendant had alleged sufficient facts to entitle him to an evidentiary hearing because C.H.'s treatment notes were testimonial under the particular facts of the case. Id. at *5. The court of appeals emphasized that the victim had returned to the hospital a third time for the express purpose of collecting evidence for the police. Id. That is what made C.H.'s notes testimonial, because the primary purpose was evidence collection for a police investigation, not medical treatment. The testimonial character of C.H.'s notes entitled the defendant to an evidentiary hearing to determine whether trial counsel's performance was deficient for not raising a Confrontation Clause objection.

The facts of the petitioner's case are distinguishable from Smith. Under Ohio v. Clark, 576 U.S. 237 (2015), whether an out-of-court statement is

"testimonial" for purposes of the Confrontation Clause is to be determined through the primary purpose test. Id. at 245. The appropriate inquiry is "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the [out-of-court statement] was to creat[e] an out-of-court substitute for trial testimony." Id. Factors relevant in the primary purpose analysis include (1) the formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant and (4) the context in which the statement was given. Id. at 244-45; see also State v. Mattox, 373 Wis. 2d 122, 142 (Wis. 2017).

In ruling on the petitioner's postconviction motion for a new trial based on an alleged Confrontation Clause violation, the trial court examined whether the primary purpose of Martinez's examination of D.D. was for treatment or a criminal investigation. This was the trial court's analysis:

> The first page of Exhibit 17 [the medical report prepared by Martinez,] is a Certification of Medical Records. Exhibit 17 also contains a "Consent for Sexual Examination by a Sexual Assault Nurse Examiner." This portion of the report shows that [. . .] the examination had a purpose other than evidence gathering. In this case, that purpose was *treatment of the victim*, which included, "prophylactic treatment for sexually transmitted infections," "a pregnancy risk evaluation," and "pregnancy prevention therapies, if appropriate and requested by [the patient]." (Exhibit 17) In consenting to treatment, the victim [D.D.] initialed her consent to give "urine and/or blood for a pregnancy test," receive "medication to reduce risk of pregnancy," be "screen[ed] for sexually transmitted infection, including [giving] cultures, body fluid samples, and/or blood," and receive "medication to prevent some sexually transmitted infections." (Id.). The report contains other data that indicate it was prepared with the purpose of documenting treatment, including demographic information of the patient, results of STD testing, results of the pregnancy test, patient health history, current

> medications, a description of any injuries, and a description of the medications and treatment provided during the course of the examination. (Id.). Moreover, the report also contains a "general consent to care," signed by D.D.'s mother, in which she agrees that she and her insurer *may be billed for the examination and services*. (Id.). [. . .] [T]he court finds that the primary purpose of the medical report was to document the consent, examination and treatment of a patient who reported a sexual assault – "not for the purpose of creating an out-of-court substitute for trial testimony." **Mattox**, 2017 WI 9, ¶3.

Dkt. No. 19-7 at 5-6.

Whether an out-of-court statement is testimonial under Clark's primary purpose test is a highly fact- and context-specific inquiry. It's true that the sexual assault treatment report notes generated by Martinez in this case and by C.H. in Smith were admitted at trial through a managing nurse, but the similarity stops there. The facts surrounding Martinez's treatment of D.D. described by the trial court show that the primary purpose was for medical treatment, including the pregnancy test and STD prevention. And D.D.'s mother consented to being billed for D.D.'s treatment. And unlike Smith, D.D. didn't return to the sexual assault treatment center for the express purpose of collecting evidence for the police. She sought treatment.

For purposes of federal *habeas* review, this court must presume that the trial court's factual determination was correct unless shown otherwise by clear and convincing evidence. See 28 U.S.C. §2254(e)(1). Based on the record, the court cannot conclude that the trial court's analysis of the primary purpose of Martinez's treatment of D.D. involved an unreasonable determination of the facts or that the court's legal analysis involved an unreasonable application of clearly established federal law.

B. Ground Two

Ground Two asserts that trial counsel was ineffective for failing to move for a mistrial because of what the prosecutor told the jury during opening statements about the State's case on Counts Four and Five related to the sexual assault of S.E. Dkt. No. 15 at 7-8. Counts Four and Five were dismissed during trial because S.E. chose not to appear.

1. *The Parties' Arguments*

The petitioner argues that the prosecutor's statements to the jury about S.E. (see dkt. no. 34-2 at 14-17) violated his Sixth Amendment rights under the Confrontation Clause. Dkt. No. 27 at 24. The respondent asserts that the court of appeals' holding was reasonable because of the presumption that juries follow instructions given to them by the court. Dkt. No. 34 at 20.

2. *The Wisconsin Court of Appeals' Decision*

The court of appeals addressed this claim in the petitioner's direct appeal. The court of appeals, applying Strickland, held that the petitioner was not prejudiced because the prosecution's statements to the jury about S.E. were not vital to the State's case against the petitioner on the sexual assault counts related to S.O. and D.D. Dixon, 2018 WL 3198768, at *4. The court of appeals also reasoned that there was no prejudice because the State did not present any evidence at trial related to S.E. and the trial court instructed the jury not to consider any opening statement comments about S.E. See id. (citing State v. Truax, 151 Wis. 2d 354, 362 (Wis. Ct. App. 1989)).

### 3. *The Court's Analysis*

The court of appeals reasonably applied Strickland to conclude that there was no prejudice when trial counsel did not move for a mistrial. It is well settled under both Wisconsin and federal law that juries are presumed to follow the instructions given to them by trial courts. See Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."); Truax, 151 Wis. 2d at 362 (same).

The record shows that the trial court instructed the jury not to consider any facts or comments regarding the two counts involving S.E. This was the trial court's instruction:

> The information in this case now contains only two counts. You didn't hear any evidence regarding counts four and five involving [S.E.], and so the Court has dismissed those counts. And you should not consider any facts or comments that you heard regarding those two counts during the opening statements by either of the parties. They shouldn't be considered for any purposes whatsoever.

Dkt. No. 34-5 at 64.

Given the trial court's instruction to the jury not to consider any of the facts or comments about S.E. made during opening statements, and the presumption that juries follow the court's instructions, there is no reasonable probability the petitioner's trial would have gone differently but for trial counsel's failure to move for a mistrial on this ground.

## C. Grounds Three and Ten

Grounds Three and Ten assert that the petitioner's appellate counsel was ineffective for failing to raise the Confrontation Clause claim related to Martinez as "plain error" and the Confrontation Clause claim related to the prosecutor's

comments about S.E. during opening statements as "prosecutorial misconduct." See Dkt. No. 15 at 8-9, 16, 25.

1. *The Parties' Arguments*

The petitioner argues that the Wisconsin Court of Appeals unreasonably construed his ineffective assistance of appellate counsel claim as duplicative of his ineffective assistance of trial counsel claim asserted in Ground One. See Dkt. No. 27 at 38. The respondent says that the Confrontation Clause claims raised in Grounds Three and Ten are just a repackaging of the same claim asserted in Ground One. The respondent further asserts that the Wisconsin Court of Appeals reasonably rejected these claims under Strickland's prejudice prong. Dkt. No. 34 at 21-22.

2. *The Wisconsin Court of Appeals' Decision*

The court of appeals initially addressed the ineffective assistance of appellate counsel claims asserted in Ground Three in its decision dated January 27, 2020 and refused to consider the claims because they had to be raised in a Knight petition.[5] Dkt. No. 19-15 at 3.

The court of appeals addressed the ineffective assistance of appellate counsel claim (designated as Ground Ten in the amended petition) in its decision dated April 27, 2022. Dkt. No. 19-24. The court held that the ineffective assistance of appellate counsel claims were procedurally defaulted

[5] A Knight petition is a state-court postconviction petition, which allows a defendant to challenge the effectiveness of his appellate counsel. See State v. Knight, 168 Wis. 2d 509, 522 (Wis. 1992) (concluding that "to bring a claim of ineffective assistance of appellate counsel, a defendant must petition the appellate court that heard the appeal for a writ of habeas corpus.").

because they repackaged the same Confrontation Clause issue with the same operative facts raised in the petitioner's direct appeal. See id. at 5-6 (citing State v. Romero-Georgana, 360 Wis. 2d 522, 545 (Wis. 2014); State v. Allen, 274 Wis. 2d 568, 576-77 (Wis. 2004); State v. Witkowski, 163 Wis. 2d 985, 990 (Wis. Ct. App. 1991)). The court of appeals further held that the petitioner's claim of plain error on the part of appellate counsel was not clearly stronger than the issue appellate counsel had raised on direct appeal. See id. at 7-8.

The court of appeals addressed this claim again in its August 30, 2022 decision. It held that the claim was procedurally barred because the petitioner "may not re-litigate an issue previously litigated 'no matter how artfully the [petitioner] may rephrase the issue.'" Dixon, 980 N.W.2d 486 (Table), 2022 WL 3754163, at *3 (Wis. Ct. App. 2022) (quoting Witkowski, 163 Wis. 2d at 990).

3. *The Court's Analysis*

In his opposition brief, the respondent states that the court of appeals' reliance on Witkowski in its August 30, 2022 decision is not an independent and adequate procedural ground that can bar this court's review of the petitioner's *habeas* claim. That's true under Witkowski, but this simply means that this court must review the last state court decision to reach the merits of the claim. See Charlton, 439 F.3d at 374. So the court must review the court of appeals' April 27, 2022 decision, which is the last decision to reach the merits of the petitioner's claim.

In the April 2022 decision, the court of appeals did not rely on Witkowski to hold that the petitioner's ineffective assistance of appellate counsel claim

was procedurally defaulted. To understand the court of appeals' holding of procedural default, it is necessary to understand Wisconsin's post-conviction procedures. The Seventh Circuit described Wisconsin's post-conviction proceedings:

> [A] prisoner may not raise in a section 974.06 motion a federal constitutional issue that was raised or could have been raised in a postconviction motion under section 974.02 or on direct appeal. [*State v.*] *Escalona-Naranjo*, 517 N.W.2d [157,] 162 [(Wis. 1994)]. The upshot is that a defendant must raise all available claims for relief, including *Strickland* claims, at the earliest opportunity—that is, in a section 974.02 motion or on direct appeal. *Id.* at 162. Failure to do so bars relief under section 974.06 unless the defendant can establish a "sufficient reason" to excuse the default. *Id.* at 162–63.
>
> Ineffective assistance of postconviction counsel can be a "sufficient reason" to excuse a prisoner's failure to bring a claim earlier. *State v. Allen*, 786 N.W.2d 124, 139 (2010). But the mere suggestion that postconviction counsel was ineffective does not by itself open the door to merits review of a defaulted claim. Instead, a prisoner must provide specific, nonconclusory factual allegations explaining why his postconviction counsel was ineffective. *Id.* at 139–40. If ineffective assistance of postconviction counsel is adequately pleaded, the trial court must then provide an evidentiary hearing and "perform the necessary factfinding function and directly rule on the sufficiency of the reason." *Id.* at 139 (quotation marks omitted). In contrast, if a petitioner fails to allege "specific facts that, if proved, would constitute a sufficient reason," the trial court will "summarily deny" the section 974.06 motion without an evidentiary hearing. *Id.* at 140.

Garcia v. Cromwell, 28 F.4th 764, 772-73 (7th Cir. 2022).

Under Allen, a claim of ineffective assistance of appellate counsel "requires more than conclusory allegations;" instead, the motion must provide "sufficient material facts—e.g., who, what, where, when, why, and how—that, if true, would entitle [the petitioner] to the relief he seeks." Allen, 274 Wis. 2d at 580-94 The petitioner also "must show that a 'particular nonfrivolous issue

was *clearly stronger* than issues that counsel did present.'" Romero-Georgana, 360 Wis. 2d at 545 (quoting Smith v. Robbins, 528 U.S. 259, 288 (2000)); see also Gray v. Greer, 800 F.2d 644, 646 (7th Cir.1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."). Allen and Romero-Georgana's procedural pleading requirements for a claim of ineffective assistance of appellate counsel are an independent and adequate state ground that can support a state court decision. See Garcia, 28 F.4th at 775; Whyte v. Winkleski, 34 F.4th 617, 625 (7th Cir. 2022).

In its April 2022 decision, the court of appeals held that the petitioner's ineffective assistance of counsel claims based on the Confrontation Clause were predicated on the same operative facts alleged in support of the Confrontation Clause claim asserted in his direct appeal. Dkt. No. 19-24 at 6. However the argument was framed (for example, as plain error), the legal issue was the same—an alleged Confrontation Clause violation—and the operative facts were the same—the absence of Martinez and the prosecutor's comments about S.E. during opening statements. The court of appeals concluded that the petitioner had failed to allege sufficient facts showing that a Confrontation Clause claim framed as plain error was clearly stronger than the issues that appellate counsel did present in the petitioner's direct appeal. See id. at 7. The court of appeals' April 2022 decision holding that the ineffective assistance of appellate counsel claim was insufficiently pled is an adequate and independent state ground that bars this court's *habeas* review of Grounds Three and Ten.

Even if Grounds Three and Ten were not procedurally barred under Allen and Romero-Georgana, there was no prejudice from appellate counsel's decision not to raise the issue of trial counsel's decision not to object to Kleist's testimony or failing to move for a mistrial. See id. at 6-8. As explained above regarding the Confrontation Clause violation asserted in Ground One, trial counsel was not ineffective for failing to raise an objection to Kleist's testimony or for failing to move for a mistrial based on the prosecutor's statements to the jury about S.E. Neither objection based on a Confrontation Clause violation would have had any merit. And because trial counsel was not ineffective for failing to raise the Confrontation Clause issue, appellate counsel cannot be faulted for failing to raise the issue. See Washington v. Boughton, 884 F.3d 692, 701 (7th Cir. 2018) ("[A]n attorney is not ineffective for failing to raise a meritless argument.").

D. Ground Four

Ground Four asserts that the petitioner's appellate counsel was ineffective for failing to investigate and raise a claim that trial counsel was ineffective for failing to investigate the petitioner's allegation that the prosecutor fabricated evidence about S.E.'s sexual assault and fabricated S.E.'s "last minute decision" not to testify at trial. Dkt. No. 15 at 9, 16.

1. *The Parties' Arguments*

The petitioner argues that the Wisconsin Court of Appeals ignored his ineffective assistance of trial and appellate counsel claim stated in Ground Four. Dkt. No. 27 at 39. The respondent asserts that the court of appeals

addressed this claim and reasonably concluded that there was no prejudice because the claims regarding S.E. were dismissed and the jury was instructed not to consider any comments during opening statements relating to S.E. Dkt. No. 34 at 22.

2. *The Wisconsin Court of Appeals' Decision*

The court of appeals did not ignore the petitioner's claim. The court considered the petitioner's ineffective assistance of trial and appellate counsel claim in its decision dated August 30, 2022. Dixon, 2022 WL 3754163, at *3-*4. It held that the petitioner had failed to establish any prejudice because of the trial court's jury instruction and the trial court's dismissal of the counts related to S.E. The court of appeals further concluded that there wasn't a reasonable probability that the trial proceedings would have turned out differently as to the petitioner's conviction on the charges that he sexually assaulted S.O. and D.D. Id. at *4.

3. *The Court's Analysis*

The court of appeals' decision was not unreasonable. As the court has concluded in its analysis of Ground Two, the petitioner was not prejudiced by the alleged failure of appellate counsel to investigate trial counsel's failure to investigate the petitioner's allegations of the prosecutor's purported fabrications. The counts relating to S.E. were dismissed and the court expressly instructed the jury not to consider any of the parties' comments about S.E. during opening statements. It is very unlikely that the trial proceedings would have been any different if the jury never had heard about

S.E. No evidence about S.E.'s sexual assault was introduced at trial. The State relied on DNA evidence taken from a sanitary pad, vaginal swabs and jeans that had been gathered from S.O. and D.D. to link the petitioner to their sexual assaults. The DNA evidence was enough for the jury to convict the petitioner.

E. Ground Five

Ground Five asserts that appellate counsel was ineffective for failing to raise a claim that trial counsel was ineffective for failing to retain a DNA expert in the petitioner's defense. Dkt. No. 15 at 17-18.

1. *The Parties' Arguments*

The petitioner argues that his trial counsel was ineffective for not hiring a DNA expert to challenge the States' DNA evidence and that this was unfairly prejudicial. Dkt. No. 27 at 39-40. The respondent contends that this claim is procedurally defaulted because the court of appeals held that it was insufficiently pled. Dkt. No. 34 at 23.

2. *The Wisconsin Court of Appeals' Decision*

The court of appeals addressed the claim asserted in Ground Five in its August 30, 2022 decision. Dixon, 2022 WL 3754163, at *4. The court of appeals held that the claim that trial counsel was ineffective was conclusory because the petitioner had "not identified what the expert's testimony would have been or how it would have rebutted the State's DNA evidence." Id. (citing Allen, 274 Wis. 2d at 585).

3. *The Court's Analysis*

Allen is a procedural pleading requirement for a claim of ineffective assistance of appellate counsel, and it is an independent and adequate state ground that can support a state court decision. See Whyte, 34 F.4th at 625. Because the court of appeals rested its decision on Allen, this claim is procedurally defaulted. That means this court cannot address it unless the petitioner can establish cause for the default and show prejudice from it, or can show that the failure to consider the claim would result in a fundamental miscarriage of justice. Kaczmarek v. Rednour, 627 F.3d 586, 591 (7th Cir. 2010) (citing Johnson v. Loftus, 518 F.3d 453, 455 (7th Cir. 2008)). The petitioner cannot show prejudice or a fundamental miscarriage of justice; as the state court of appeals has pointed out, the petitioner has not identified what the DNA expert's testimony would have been or how it would have rebutted the State's DNA evidence. The petitioner's argument is circular—he says that he needed a DNA expert at his trial, and thus that his counsel was ineffective in failing to secure an expert witness report. But he does not explain why he believes that any defense DNA expert would have provided an opinion helpful to him, or one that would have convinced a jury not to believe the State's evidence.

F. Grounds Six and Eleven

Grounds Six and Eleven assert that appellate counsel was ineffective for failing to raise an issue that trial counsel was ineffective for not moving to suppress the State's DNA evidence. Dkt. No. 15 at 19-20, 26-27.

1. *The Parties' Arguments*

The petitioner argues that certain statements made by the detective during his interrogation were unduly coercive, including that if the petitioner did not agree to provide a DNA sample it would be "used as an admission of guilt that will be used against you." Dkt. No. 27 at 41. He argues that trial counsel should have moved to suppress the DNA sample due to the detective's coercive statements. Id. The respondent asserts that the court of appeals reasonably determined that there was no prejudice because the petitioner gave investigators his DNA sample voluntarily. Dkt. No. 34 at 25.

2. *The Wisconsin Court of Appeals' Decision*

The court of appeals held that Claim Six was insufficiently pled because the petitioner did not allege a Miranda violation. Dixon, 2022 WL 3754163, at *4. It also held that the petitioner's claim of ineffective assistance of trial counsel for not moving to suppress the DNA sample had no merit because the petitioner gave the sample voluntarily. Id. at *5.

3. *The Court's Analysis*

The court of appeals' decision was reasonable. The petitioner testified at trial that he received a Miranda warning. See Dkt. No. 34-5 at 32-33. He also testified that he voluntarily gave the detective a buccal swab DNA sample because he "had nothing to hide." Id. at 33. There was no prejudice because a motion to suppress would not have had any merit under these circumstances. See Washington, 884 F.3d at 701.

G. Ground Seven

Ground Seven asserts that appellate counsel was ineffective for not raising the issue that trial counsel was ineffective for not investigating certain DNA evidence the petitioner provided in 2012. Dkt. No. 15 at 21-22. The petitioner first raised this claim in a supplemental motion for a new trial that he filed with the trial court on April 12, 2017. Dkt. No. 19-4 at 7-9. The petitioner had alleged that the State's claim that it collected DNA from him in 2012 was "inaccurate." He alleged that "no such sample from 2012 existed and that no such sample was transported to the crime lab for analysis and comparison." See Dkt. No. 19-4 at 8.

1. *The Parties' Arguments*

The petitioner argues that the court of appeals unreasonably rejected the factual allegations supporting his claim rather than accepting them as true based on the pleadings. Dkt. No. 27 at 38-39. The respondent contends that this claim is procedurally defaulted because the court of appeals concluded that the petitioner's argument was undeveloped. Dkt. No. 34 at 25-27.

2. *The Wisconsin Court of Appeals' Decision*

The court of appeals last considered the claim asserted in Ground Seven in its August 30, 2022 decision. The court of appeals observed that the State had responded to the petitioner's supplemental new trial motion with supporting police reports, a form signed by the petitioner consenting to DNA swabs, chain of custody forms and a crime lab report showing that the petitioner did in fact provide the State with his DNA when he was arrested in

2012. Dixon, 2022 WL 3754163, at *5. The petitioner's postconviction counsel withdrew the claim following the State's response. See Dkt. No. 19-7 at 7 n. 3. The court of appeals held that the petitioner's claim was procedurally barred because he previously had raised the claim in the supplemental postconviction motion. See Dixon, 2022 WL 3754163, at *5 (citing Wis. Stat. §974.06(4); Witkowski, 163 Wis. 2d at 990). The court of appeals also concluded that the claim was undeveloped because the petitioner had failed to address the State's documentary evidence showing that the petitioner had in fact voluntarily provided a DNA sample in 2012. Id.

3. *The Court's Analysis*

The Wisconsin Court of Appeals' holding that the claim asserted in Ground Seven previously was litigated and therefore was procedurally barred was not erroneous. But that court's reliance on the Witkowski rule doesn't mean this court is unable to review the claim at all. Again, it means only that "the court of appeals' decision on direct appeal, not its later decision, is the decision the federal court reviews in considering a habeas petition." See Robbins v. Hepp, Case No. 15-CV-1343, 2022 WL 541560, at *6 (E.D. Wis. Feb. 23, 2022) (citing Warren v. Baenen, 712 F.3d 1090, 1098 (7th Cir. 2013)).

It appears the court of appeals did not address this claim in the petitioner's direct appeal, but that is because the petitioner's appellate counsel didn't raise the issue in the direct appeal briefing. See State v. Dixon, Case No.

2017AP1252-CR (Br. of Appellant), (available at https://wscca.wicourts.gov).[6] So the court must review the last state court decision to reach the merits of the claim. See Charlton, 439 F.3d at 374. That's the trial court's June 9, 2017 decision. See Dkt. No. 19-7. There, the trial court adopted the State's analysis from its response to the supplemental postconviction motion, including the State's response to the section of the motion that postconviction counsel had withdrawn. See id. at 7.

The State identified clear documentary evidence showing that the petitioner was arrested in 2012, that he voluntarily gave a DNA sample to State authorities in 2012, that the DNA sample was transported to the crime lab for analysis and that the analysis identified the petitioner as the source of DNA from the charges involving S.O. and D.D. The State requested that postconviction counsel withdraw the meritless claim and counsel (wisely) did so. See Dkt. No. 19-5 at 5.

For purposes of Strickland, there was no prejudice because trial counsel was not ineffective for failing to raise a meritless claim. The trial court's adoption of the State's analysis was reasonable.

H. Ground Eight

Ground Eight asserts that appellate counsel was ineffective for failing to raise the issue that trial counsel was ineffective for failing to object to certain

---

[6] The petitioner provided this court with a copy of the September 29, 2017 direct appeal brief, see dkt. no. 19-8, but that copy is incomplete because it omits pages 50-55. The court reviewed the publicly available copy of the petitioner's appeal brief to confirm that the claim asserted in Ground Seven was not raised with the court of appeals during the direct appeal.

limitations the trial court placed on the petitioner's testimony in his defense during trial. Dkt. No. 15 at 23-24.

1. *The Parties' Arguments*

The petitioner argues that the trial court should have allowed him to tell the jury that he never had been convicted of a crime. He also asserts that the trial court should not have prohibited him from telling the jury about his claim that he never provided a DNA sample to state authorities in 2012 and his allegation of "DNA fraud"—his claim that authorities sought to frame him. See Dkt. No. 27 at 39-40; see also Dkt. No. 15 at 21-23. The respondent says that the court of appeals reasonably concluded that there was no prejudice because given the State's evidence, the outcome of the trial would have been no different. Dkt. No. 34 at 27-28.

2. *The Wisconsin Court of Appeals' Decision*

The court of appeals addressed Ground Eight in its August 30, 2022 decision. It held that the petitioner's purported lack of a criminal record was irrelevant to whether he sexually assaulted D.D. and S.O. See Dixon, 2022 WL 3754163, at *5. The court of appeals rejected the petitioner's argument that he should have been allowed to tell the jury the State did not collect his DNA in 2012 because he did not address the voluminous evidence showing that he did so. Id. at *6. Finally, the court of appeals held that there was no prejudice from the fact that petitioner's trial counsel told him that he could testify only that he could not "recall" having sexual intercourse with D.D. and S.O. rather than denying it outright. This was because the State's DNA evidence, taken from

physical items collected from D.D. and S.O., that matched the petitioner's was extremely compelling and any testimony that "I didn't sexually assault those women" vs. "I don't recall" likely would not have changed the jury's verdict of conviction. See id.

3. *The Court's Analysis*

It is unlikely that the outcome of the trial would have been any different if the petitioner had told the jury about his "DNA fraud" allegations. The State introduced testimony from Detective Stojsavljevic who interrogated the petitioner in 2012. He testified that he had collected DNA samples with buccal swabs from the petitioner and he identified the petitioner in the courtroom. Dkt. No. 34-4 at 12-14, 19-20. The detective authenticated the two buccal swabs, and they were admitted into evidence. Id. The detective also established the chain of custody for the buccal swabs taken from the petitioner. Id. at 15-17. The petitioner's testimony corroborated the detective's account about the DNA sample. Dkt. No. 34-5 at 32-33. Whatever the petitioner may have told the jury about a supposed plot by authorities to commit "DNA fraud," it is improbable that the jury would have believed it in the face of the overwhelmingly clear evidence showing that the petitioner voluntarily gave authorities his DNA sample because he "had nothing to hide."

The limitation placed on petitioner by his trial counsel about assaulting D.D. and S.O.—"I didn't do it" vs. "I don't recall doing it"— likely would not have changed the outcome either. S.O.'s sexual assault occurred in 2002 when she was thirteen. D.D.'s sexual assault occurred in 2011 when she was

fourteen. The petitioner was tried before a jury in May 2015. Given the passage of time, neither D.D. nor S.O. could remember the petitioner and they weren't asked to identify him as their assailant at trial. The petitioner testified that he didn't recognize D.D. or S.O. when they testified and had no recollection of assaulting either of them.

It is extremely unlikely that the petitioner testifying that he didn't assault D.D. and S.O. would have changed the trial outcome. The State needed to prove only that the petitioner had sexual intercourse with D.D. and S.O. when they were under the age of sixteen. D.D. and S.O. testified that they were sexually assaulted by a male assailant when they were fourteen and thirteen, respectively. Both testified that they went to the sexual assault treatment center shortly after their assaults and provided sanitary pads, vaginal swabs and clothing containing the assailant's semen. The State introduced evidence showing the chain of custody of the sanitary pads, vaginal swabs and clothing taken from D.D. and S.O. at the sexual assault treatment center. Analysts from the state crime lab testified that they developed a DNA profile of the semen taken from S.O.'s sanitary pad and D.D.'s vaginal swabs and jeans. The analysts also developed a DNA profile from the DNA sample the petitioner provided authorities in 2012. The DNA profile of the semen taken from S.O.'s sanitary pad and D.D.'s vaginal swabs and jeans matched the petitioner's. The analysts testified that there was a 1-in-241-quintillion chance that the DNA profile of the semen belonged to someone other than the petitioner. This evidence was more than enough for the jury to convict him of sexually

assaulting D.D. and S.O. Whether the petitioner testified that he could not recall assaulting D.D. and S.O. or denied it outright, the DNA evidence sealed the outcome for the jury.

The court of appeals' conclusion that there was no prejudice from the limitations on the petitioner's testimony was reasonable given the evidence presented at trial and what the State was required to prove to convict the petitioner of sexually assaulting D.D. and S.O.

I. <u>Ground Nine</u>

Ground Nine asserts that trial counsel was ineffective for failing to request a jury instruction that addressed eyewitness identification testimony, Wis. JI-Criminal 141 (2013). Dkt. No. 15 at 24. This jury instruction advises the jury that they should consider the reliability of any identification of the defendant made by a witness who had the opportunity to observe the offender at the time of the offense and later to make a reliable identification. The instruction also advises the jury to consider the credibility of the witness making an identification of the defendant the same way they would consider the credibility of any other witness.

1. *The Parties' Arguments*

The petitioner argues that the eyewitness jury instruction was crucial for him to receive a fair trial. Dkt. No. 27 at 47. The respondent asserts that this claim is not justiciable on federal *habeas* review because it is a state law issue, not a federal constitutional or legal issue. Dkt. No. 34 at 28-30. The respondent also argues that there was no prejudice because the State did not rely on

eyewitness identification testimony; the State relied on DNA evidence to prove that the petitioner committed the two sexual assaults for which he was charged. Id.

### 2. *The Wisconsin Court of Appeals' Decision*

The court of appeals held that there was no prejudice from trial counsel failing to move for the eyewitness jury instruction because the State solely relied on DNA evidence to prove that the petitioner sexually assaulted D.D. and S.O. Because the State did not rely on D.D. and S.O.'s testimony to identify the petitioner as their assailant, the absence of the eyewitness jury instruction didn't mislead the jury or misstate the law. See Dixon, 2022 WL 3754163, at *6.

### 3. *The Court's Analysis*

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (citing 28 U.S.C. §2241; Rose v. Hodges, 423 U.S. 19, 21 (1975)). And the Supreme Court has said that whether a "[a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief." Id. at 71-72.

Whether or not this claim is justiciable on *habeas* review, the court of appeals' decision was not clearly erroneous. The petitioner's trial counsel was not ineffective for failing to request the witness instruction when the State

relied on DNA evidence to identify the petitioner. The court of appeals' holding was correct, so it cannot constitute an unreasonable application of federal law.

J. Ground Twelve

Ground Twelve asserts that the Wisconsin Court of Appeals unreasonably denied the petitioner's §974.06 postconviction motion for the State to produce a video of Detective Stojsavljevic's interrogation of the petitioner during his 2012 arrest. Dkt. No. 15 27-28.

1. *The Parties' Arguments*

The petitioner asserts that the court of appeals' denial of his postconviction discovery motion constitutes a due process violation. Dkt. No. 27 at 45. The respondent argues that the court of appeals' decision on a discovery issue is based on state law and is not reviewable by this court under a federal *habeas* proceeding. Dkt. No. 34 at 30.

2. *The Wisconsin Court of Appeals' Decision*

Under Wisconsin law, a defendant may obtain postconviction discovery "when the sought-after evidence is relevant to an issue of consequence." State v. O'Brien, 223 Wis. 2d 303, 321 (Wis. 1999). Evidence is consequential only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. Id. at 320-21. "The mere possibility that an item of undisclosed information might have helped the defense' is not enough." State v. Ziebart, 268 Wis. 2d 468, 488-89 (Wis. Ct. App. 2003) (quoting O'Brien, 223 Wis. 2d at 320).

The court of appeals concluded that the petitioner wasn't entitled to postconviction discovery because there wasn't a reasonable probability that the interrogation video would have changed the outcome of the petitioner's trial. See Dixon, 2022 WL 3754163, at *6.

3. *The Court's Analysis*

The petitioner must demonstrate that the state court decision denying postconviction discovery "was contrary to, or involved an unreasonable application of, clearly established Federal law," Warren, 712 F.3d at 1096, or was "based on an unreasonable determination of the facts." 28 U.S.C. §2254(d). Under §2254(e)(1), "a determination of a fact issue made by a State court shall be presumed to be correct." A federal *habeas* court must "defer to the state court's factual findings" and presume those findings to be correct "unless the petitioner rebuts the presumption by clear and convincing evidence." Holt v. Boughton, 170 F.4th 1074, 1083 (7th Cir. 2026) (citing 28 U.S.C. §2254(e)(1)).

Although the court of appeals did not cite federal law when articulating the standard for when a defendant may be entitled to postconviction discovery, it did cite O'Brien. See Dixon, 2022 WL 3754163, at *6. And O'Brien outlined the correct standard for postconviction discovery based on federal law. See 223 Wis. 2d at 320-21 (citing United States v. Bagley, 473 U.S. 667, 682 (1985) (plurality opinion); Strickland, 466 U.S. at 694; United States v. Agurs, 427 U.S. 97, 104 (1976)).

The court of appeals reasonably denied the petitioner's postconviction discovery motion because there wasn't a reasonable probability that he would have been acquitted had the interrogation video been produced. When denying the motion, the court of appeals relied on the fact that the petitioner had testified at trial that Detective Stojsavljevic provided him with a Miranda warning during his interrogation. The petitioner had agreed to talk with Stojsavljevic and had consented to giving the detective a DNA sample.

The court of appeals' denial of the petitioner's postconviction discovery motion is entitled to deference, and the petitioner has not shown by clear and convincing evidence that the denial was factually incorrect or involved an unreasonable application of clearly established federal law. Even if the interrogation video had been produced and showed that the detective had made the allegedly coercive statements during the interrogation, that doesn't change the petitioner's testimony that he consented to the interrogation and voluntarily provided the DNA sample. There is no reasonable probability that discovery of the interrogation video would have changed the outcome of the petitioner's conviction. In other words, the interrogation video was not of consequence to the outcome of the petitioner's trial.

## IV. Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard

for making a "substantial showing" is whether "reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotations omitted). The court declines to issue a certificate of appealability, because reasonable jurists could not debate whether the petitioner's claims warrant *habeas* relief under 28 U.S.C. §2254(d).

## V. Conclusion

The court **DENIES** the amended petition for writ of *habeas corpus* under 28 U.S.C. §2254. Dkt. No. 15.

The court **DECLINES TO ISSUE** a certificate of appealability.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 27th day of August, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**